**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

PERRONE LEATHER, LLC, d/b/a
PERRONE AEROSPACE,

                                                                 6:16-cv-00589 (BKS) (ATB)

                               Plaintiff,

v.

SELECTIVE WAY INSURANCE COMPANY,

                               Defendant.

---

**APPEARANCES:**

*For Plaintiff:*
Jeanne M. Gonsalves Lloyd
Friedman, Hirschen & Miller, LLP
100 Great Oaks Blvd., Suite 124
Albany, NY 12203

*For Defendant:*
Steven E. Peiper
Hurwitz & Fine, P.C.
424 Main Street, Suite 1300
Buffalo, NY 14202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Perrone Leather, LLC, d/b/a Perrone Aerospace, brings this diversity action[1]

against Defendant Selective Way Insurance Company, alleging that Defendant improperly

denied coverage of costs associated with replacing leather hides that Plaintiff sold to Norwegian

Airlines in 2013 for use in seat and headrest covers on its commercial airplanes.  (Dkt. No. 2).

---

[1] Defendant removed this action from New York state court on the basis of diversity of citizenship under 28 U.S.C.
§ 1332.  (Dkt. No. 1).

Plaintiff seeks a declaratory judgment setting aside Defendant's denial of coverage and ordering that "the defendant has a duty to reimburse to the plaintiff the damages it has suffered as a result." (Dkt. No. 2, at 6). Plaintiff now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 42). Defendant opposes Plaintiff's motion and cross-moves for summary judgment.[2] (Dkt. No. 45). For the reasons below, Plaintiff's motion is granted and Defendant's motion is denied.

## II.    BACKGROUND[3]

### A.    Sale of Defective Leather to Norwegian Airlines

Plaintiff is a New York company that engages in "the manufacture of leather for the aerospace industry," among other aerospace-related endeavors. (Dkt. No. 42-1, ¶ 2). On April 25, 2013, Plaintiff sold 34,776 square feet of leather hides to Norwegian Air Shuttle ASA ("Norwegian Airlines") for $154,057.68. (Dkt. No. 42-1, ¶ 3; Dkt. No. 42-15). At the request of Norwegian Airlines, Plaintiff shipped the hides to a company called Timco Aerosystems ("Timco"), where the hides were manufactured into "replacement seat and headrest covers to be installed and utilized on Norwegian Airlines aircraft." (Dkt. No. 42-1, ¶ 4). To manufacture the leather hides into seat and headrest covers, Timco "cut the leather according to patterns supplied

---

[2] Plaintiff argues that Defendant's cross-motion for summary judgment, served on September 5, 2017, is untimely. (Dkt. No. 46-1, at 3–4). The Court notes, however, that the return date of Plaintiff's motion was September 21, 2017, making the deadline for any cross-motion or motion in response September 4, 2017—a legal holiday. *See* Fed. R. Civ. P. 6(a)(1)(C) ("When the period is stated in days or a longer unit of time . . . include the last day of the period, but if the last day is a . . . legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."); N.D.N.Y. Local Rule 7.1(c).

[3] The facts stated herein are drawn from the parties' submissions, including both parties' statements of material facts, (Dkt. Nos. 42-1, 45-3), responses thereto, (Dkt. Nos. 44, 46), and exhibits submitted, to the extent that such exhibits could be presented in a form that would be admissible as evidence. Where facts stated in a party's L.R. 7.1(a)(3) Statement are supported by citation to testimonial or documentary evidence in the record and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e). The Court, however, notes that "[t]he record for purposes of the Statement of Material Facts . . . does not . . . include attorney's affidavits," N.D.N.Y. L.R. 7.1(a)(3), and accordingly, has disregarded portions of Defendant's statement of material facts that cite solely to attorney's affidavits.

by an entity . . . other than [Plaintiff], sewed the leather pieces into seat and headrest covers, and attached foam cushions to the covers, all according to the specifications supplied by Norwegian [Airlines]."  (Dkt. No. 42-24, ¶¶ 6–7).  Aside from supplying the leather hides, Plaintiff was not involved with the manufacture or installation of the seat and headrest covers.  (Dkt. No. 42-1, ¶¶ 5–6).

On October 9, 2013, Norwegian Airlines notified Plaintiff that the "finish on the leather supplied by [Plaintiff] which had been used to manufacture the seat and headrest covers on one of its aircraft appeared be peeling after the aircraft had seen only 47 cycles since the seat and headrest covers that were manufactured using leather hides supplied by plaintiff had been installed."  (Dkt. No. 42-1, ¶ 7).  In November 2013, one of Plaintiff's employees traveled to Stockholm, Sweden, where he confirmed that the "finish on the seat covers was indeed peeling (delaminating) from the leather substrate of some of the seat and headrest covers that were manufactured using leather supplied by" Plaintiff.  (*Id.* ¶ 8).  Shortly thereafter, Plaintiff was informed that the seats and headrest covers on two other Norwegian Airlines aircraft, also fitted with seat and headrest covers manufactured using Plaintiff's leather, were delaminating.  (*Id.* ¶ 9).  Plaintiff performed tests on a sample of "leather it retained from the same manufacturing lot as the leather sold to" Norwegian Airlines, which ultimately revealed that the delamination was "caused by the continued and repeated exposure of the leather to oils from passengers' hair and bodies, as well as hair products."  (*Id.* ¶ 10).

In June of 2014, Plaintiff "agreed to start the process to replace the leather used to manufacture the affected seat and headrest covers on the three affected Norwegian aircraft." (Dkt. No. 42-24, ¶ 20).  Plaintiff contends, however, that "no final decision was made by [Plaintiff] as to who would ultimately bear the costs associated with cutting, sewing, fashioning

and installation of the replacement covers until after [Defendant] had advised [Plaintiff] on

November 24, [2014][4] that these costs would be covered by [Defendant]."  (*Id.*).

### B.    Commercial General Liability Insurance Policy

Plaintiff was insured under a Commercial General Liability ("CGL") insurance policy for

the period of March 1, 2013 to March 1, 2014, issued by Defendant.  (Dkt. No. 42-1, ¶ 12).  The

policy provided for a "General Aggregate Limit (other than Products-Completed Operations) of

$2,000,000.00" and an "Each Occurrence Limit of $1,000,000.00."  (*Id.* ¶ 13).  The policy

provided for, in relevant part:

> **1. Insuring Agreement:**
>
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
>
> **b.** This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"'; [and]
>
> (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

(Dkt. No. 42-14, at 26).  The policy contained several exclusions, and described several

circumstances where coverage would not be provided, (Dkt. No. 42-1, ¶ 83), indicating that "this

policy does not apply to":

---

[4] In the Affidavit of William Perrone, Jr., this date is listed as "November 24, 2017"—presumably this is an error.

**k. Damage to Your Product:** "Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work:** "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property not Physically Injured:** "Property damage" to "impaired property" or property that has not been physically injured, arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property:** Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of: (1) "Your product"; (2) "Your work"; or (3) "Impaired property"; if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Dkt. No. 42-14, at 13)  Furthermore, the policy contained definitions for various terms used throughout the key provisions described above.  In relevant part, these definitions included:

**8. "Impaired Property"** means tangible property, other than "your product" or "your work," that cannot be used or is less useful because: (a) it incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous, or (b) you have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

. . . .

**13. "Occurrence"** means an incident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

**16. "Products-completed operations hazard":** (a) includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" . . . . (b) does not include "bodily injury" or "property damage" arising out of: . . . (3) products or operations for which the classification, listed in the declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate.

**17. "Property Damage"** means: (a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it. (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

. . . .

**21. "Your Product":**

**a.** Means: (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (a) You; (b) Others trading under your name; or (c) A person or organization whose business or assets you have acquired; and . . . .

**b.** Includes: (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance, or use of "your product"; and (2) The providing of or failure to provide the warnings or instructions.

. . . .

**22. "Your Work":**

**a.** Means: (1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes: (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your

work," and (2) The providing of or failure to provide warnings or instructions.

(Dkt. No. 42-14, at 21–24).

### C.    Claim and Coverage Disclaimers

Plaintiff alleges that, "at the beginning of 2014, Perrone put defendants' agent, Hayes and Warmonth,[5] on notice that Norwegian Airlines was making a claim to have the seat and headrest covers replaced at Perrone's expense." (Dkt. No. 42-1, ¶ 11). Defendant, however, denies that "Plaintiff's broker Hayes & Warmounth is [its] agent," (Dkt. No. 44, ¶ 11), and contends that the claim was not reported until one "year later, via an Acord [sic] dated October 30, 2014," when Plaintiff "sought coverage under the Commercial Liability Coverage issued by Selective to Perrone," (Dkt. No. 45-3, ¶ 5). In any event, the record indicates that Defendant began processing Plaintiff's claim in October of 2014 or shortly thereafter. (*See id.* ¶ 15).

Plaintiff's claim was assigned to Thomas Kaffenberger, a Claims Management Specialist employed by Defendant. (*Id.*). On November 24, 2014, Kaffenberger informed Plaintiff by telephone that, although the policy did not cover the cost of replacing the leather hides, Defendant would "pay for [the] resulting damage," (*id.* ¶ 21), meaning the cost of "recutting, resewing and the reinstallation of the leather seat covers," (*id.* ¶ 22). Kaffenberger testified at deposition that he was aware at that time that Plaintiff had "undertaken the process of replacing the leather and incurring the costs to have the leather cut, sewn, refashioned into seat and headrest covers, and reinstalled on the aircraft," (Dkt. No. 42-1, ¶ 26; Dkt. No. 42-8, at 53–54), and that he believed that Plaintiff "was already in the process of making the corrections with the airlines prior to reporting it to us," (Dkt. No 42-8, at 42). On December 10, 2014, Defendant

---

[5] The parties provide different spellings throughout their filings, but the correct title of the "Producer" of the policy under which Plaintiff was insured appears to be "Hays & Wormuth Inc." (Dkt. No. 42-14, at 4).

issued a "Disclaimer of Coverage" to Plaintiff, indicating that "[t]here is no coverage to replace your product or workmanship. Resulting damage caused by your product or workmanship would be covered." (Dkt. No. 42-13, at 47). Kaffenberger testified that it was his understanding that the word "product" pertained to the leather hides only, and that "the only portion of the claim being denied at that point was the . . . cost to replace the actual leather hides supplied by [Plaintiff]." (Dkt. No. 42-8, at 29, 40). Kaffenberger also testified that, at that time, he believed that the December 10, 2014 disclaimer would be Defendant's final determination as to coverage of Plaintiff's claim. (*Id.* at 42).

On February 13, 2015, Kaffenberger emailed Plaintiff stating that Defendant "was handling on behalf of [Plaintiff] the claim for damage to Norwegian Airlines['] seats after your leather delaminated. . . . What is the cost to cut, sew and install the seats? Please forward proof of the cost. The costs of the leather would not be covered under the policy." (Dkt. No. 42-1, ¶ 51). On April 2, 2015, Plaintiff responded that "[w]e have nearly completed the replacement of the seat covers" and inquired about "next steps in completing" the claim. (*Id.* ¶ 53). On April 11, 2015, Kaffenberger replied that "[t]he next step is documentation to support your claim. Please forward to my attention invoices showing the cost to cut, sew and install the seats. We cannot cover the cost to replace your product which is the leather." (*Id.* ¶ 54). In May 2015, Plaintiff provided Defendant an estimate of the costs associated with cutting, sewing, and installing seats with new covers totaling approximately $212,000, as well as invoices that had been issued to-date, a sample piece of the delaminated leather, and photos of the defective seats. (*Id.* ¶¶ 58–61).

On October 1, 2015, Plaintiff submitted the final invoice associated with installing the replacement seats and inquired about the status of its claim. (*Id.* ¶ 66; Dkt. No. 42-13, at 30–31).

Defendant responded that same day, indicating that "[t]here is no coverage that is available to [Plaintiff].  All the work of the repair the airline seats [sic] is part of your product."  (Dkt. No. 42-1, ¶ 67; Dkt. No. 42-13, at 30).  On October 6, 2015, Defendant issued a full disclaimer of any coverage related to Plaintiff's claim for the work to replace the defective leather.  (Dkt. No. 42-1, ¶ 68).  The new disclaimer recited the same "Facts of the Claim" as the December 10, 2014 disclaimer, but now included recitation of exclusion "n. Recall of Product, Work on Impaired Property.  (*Id.* ¶ 70; *see* Section II.B, *supra*).  The new October 6, 2015 disclaimer concluded that Plaintiff's claim was excluded from coverage: "The occurrence which is the defective leather did not cause any of the damages/costs.  These are costs associated with remediation of the defective product.  Remediation costs associated with defective workmanship including the costs associated with getting to the defective work are neither fortuitous nor property damage resulting from an occurrence."  (Dkt. No. 42-1, ¶ 71).  Kaffenberger testified that it was his understanding that the basis for denying Plaintiff's claim was excluded under Exclusions k, *l*, m, and n.  (*Id.* ¶ 82; Dkt. No. 42-8, at 71–72; *see* Section II.B *supra*).

Ultimately, Norwegian Airlines completed installation of the replacement seat and headrest covers on its aircraft by September 2015 at a cost of $197,100.05—all of which was borne by Plaintiff.  (Dkt. No. 42-24, ¶¶ 41–42).

### D.    Procedural Background and Instant Action

On May 10, 2016, Plaintiff initiated an action in New York State Supreme Court, Montgomery County, seeking a "declaration of judgment" that: (i) the "Disclaimer of Coverage issued by defendant to the plaintiff dated October 5, 2015 is improper and that the said Disclaimer of Coverage is vacated and set aside"; and (ii) that Defendant "has a duty to reimburse and indemnify the plaintiff for the damages it has suffered as a result of defendant's improper and unimley [sic] Disclaimer of Coverage in the sum of $213,707.12, plus interest."

(Dkt. No. 42-3, at 7).  On May 20, 2016, Defendant removed the action to the Northern District of New York on the basis of diversity of citizenship.  (Dkt. No. 42-4).  Plaintiff has since clarified that it "is seeking to recover . . . the damages to Norwegian [Airlines], as a result of the delamination of the leather supplied by [Plaintiff], . . . that is the costs to cut, sew fashion, ship an install the replacement seat and headrest covers, which costs amount to $197,100.05, plus interest from October 6, 2015."  (Dkt. No. 46, ¶¶ 4–5).

Plaintiff moves for summary judgment on the bases that: (i) the plain language of the Commercial General Liability indicates that the costs associated with replacing the leather contained within the seats and headrests should be covered by the policy; (ii) the circumstances of the claim do not fall within any of the exclusions contained within the policy; (iii) in any event, Defendant should be estopped from disclaiming coverage because Plaintiff acted in reliance upon Defendant's December 14, 2014 partial disclaimer indicating that replacement costs would be covered.  (Dkt. No. 42-25, at 4, 13, 20).  In opposition to Plaintiff's motion and in support of its cross-motion for summary judgment, Defendant argues that: (i) the Commercial General Liability policy does not provide coverage for costs associated with replacing Plaintiff's leather; (ii) the circumstances of Plaintiff's claim are excluded from coverage; (iii) the December 14, 2014 partial disclaimer of liability does not bar Defendant from denying Plaintiff's claim.  (Dkt. No. 45-2, at 8, 14, 20).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see*

*also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The

movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also*

*Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment

appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a

reasonable juror to return a verdict in his or her favor on an essential element of a claim"

(internal quotation marks omitted)).

   If the moving party meets this burden, the nonmoving party must "set out specific facts

showing a genuine issue for trial."  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at

323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary

judgment motion, the district court must construe the facts in the light most favorable to the non-

moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Still, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome

a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)

(quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore,

"[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of

material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Upon cross-motions for summary judgment, the Court must "in each case constru[e] the evidence in the light most favorable to the non-moving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621–22 (2d Cir. 2008); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

Finally, where "the sole question presented to the Court is the interpretation of a clear and unambiguous written agreement, the issue is one of law and may be properly decided by the Court upon a motion for summary judgment." *Amin Realty, LLC v. Travelers Prop. Cas. Co.*, No. 05-cv-195, 2006 U.S. Dist. LEXIS 40867, at *8, 2006 WL 170401, at *3 (E.D.N.Y. June 20, 2006) (citing *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 775 F. Supp. 606, 609 (S.D.N.Y. 1991), *aff'd*, 961 F.2d 387 (2d Cir. 1992)).

## IV.    DISCUSSION

"Under New York law . . . an insurer's obligation to indemnify an insured must be based on the insurance agreement." *Jakobson Shipyard*, 961 F.2d at 389.[6]  The language of the contract must be "interpreted according to common speech and consistent with the reasonable expectation of the average insured," and any "[a]mbiguities in an insurance policy are to be construed against the insurer." *Dean v. Tower Ins. Co. of N.Y.*, 19 N.Y.3d 704, 708 (2012). "Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage." *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 218 (2002).  "[P]olicy exclusions are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Incorporated Vill. of*

---

[6] A federal court sitting in a diversity action applies the choice of law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  New York law requires that a court apply the law of the state with the "most significant interest in the case."  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000). The parties do not dispute that New York law applies in this case.  (*See* Dkt. No. 42-25, at 6; Dkt. No. 45-2, at 11).

*Cedarhurst v. Hanover Ins. Co.*, 89 N.Y.2d 293, 298 (1996). "To negate coverage by virtue of

an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable

language, is subject to no other reasonable interpretation, and applies in the particular case."

*Hotel des Artistes, Inc. v. General Acc. Ins. Co. of Am.*, 775 N.Y.S.2d 262, 268 (1st Dep't 2004),

*abrogated on other grounds by KeySpan Gas East Corp. v. Munich Reins. America, Inc.*, 23

N.Y.3d 583 (2014). Once the insurer "establishes that a policy exclusion applies, the burden

shifts to the policyholder to prove that an exception to that exclusion applies." *Ment Bros. Iron*

*Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012) (quoting

*Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 89 N.Y.2d 621, 634 (1997)).

### A.    "Property Damage" Caused by an "Occurrence"

The CGL policy states that Defendant "will pay those sums that the insured becomes

legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which

this insurance applies," under circumstances where that bodily injury or property damage is

"caused by an 'occurrence' that takes place in the 'coverage territory.'" (Dkt. No. 42-14, at 26).

The CGL policy defines "occurrence" to mean "an accident, including continuous or repeated

exposure to substantially the same general harmful conditions." (*Id.* at 23). Plaintiff argues that

the delamination of the leather constitutes an "occurrence" of "property damage" as defined by

the policy because its "defective . . . leather hides were incorporated into a third-party's finished

products" and resulted in "damage or impairment to the finished product—the seat and headrest

covers—and Norwegian's aircraft onto which they were installed." (Dkt. No. 42-25, at 10–11).

Because Plaintiff "neither manufactured nor installed the airplane seats or headrest covers," but

"merely supplied its product—leather hides—which were incorporated into another product . . .

manufactured by another entity," the delaminating leather constitutes "property damage" to the

"three aircraft[s] and the seat and headrest covers installed therein." (*Id.* at 12). Defendant

responds that, because "all loss is occasioned solely out of [Plaintiff's] own faulty work product" without causing damage to the larger seat structure or airplane as a whole, the circumstances here do not give rise to "property damage" caused by an "occurrence" as required to trigger coverage under the CGL policy.  (Dkt. No. 45-2, at 11).  For the following reasons, the Court agrees with Plaintiff.

Under New York law, a "[b]reach of contract or warranty is only an 'occurrence' if, as a result of the breach, the defective product damages property other than the defective product itself."  *Franco Belli Plumbing & Heating & Sons, Inc. v. Liberty Mut. Ins. Co.*, No. 12-cv-128, 2012 U.S. Dist. LEXIS 56761, at *16, 2012 WL 2830247, at *6 (E.D.N.Y. Apr. 19, 2012). Where, however, "the insured unintentionally sells a product that is allegedly defective and that is incorporated into a third-party's finished product, the resulting impairment to the finished product is an 'occurrence.'"  *Chubb Ins. Co. of N.J. v. Hartford Fire Ins. Co.*, No. 97-cv-6935, 1999 U.S. Dist. LEXIS 15362, at *14, 1999 WL 760206, at *4 (S.D.N.Y. Sept. 27, 1999), *aff'd*, No. 00-7283, 2000 U.S. App. LEXIS 25712, 2000 WL 1528660 (2d Cir. Oct. 16, 2000).  "As stated by the Second Circuit, 'a breach of contract or warranty can be an "occurrence" if, as a result of the breach, property sold by the insured to a third party, which was then incorporated into other property belonging to the third party, caused damage to this other property.'" *Thruway Produce, Inc. v. Mass. Bay Ins. Co.*, 114 F. Supp. 3d 81, 93 (W.D.N.Y. 2015) (quoting *Chubb*, 2000 U.S. App. LEXIS 25712, at *2, 2000 WL 1528660, at *1).  In other words, courts find an "occurrence" causing "property damage" where "the insured's product was integrated into a larger entity or structure that was *not* the work product of the insured; when the component product proved to be defective, the defect caused damage to the larger structure and thus constituted an 'external force' with regard to the property or persons of third parties."  *Amin*

*Realty, L.L.C. v. Travelers Prop. Cas. Co.*, No. 05-cv-195, 2006 U.S. Dist. LEXIS 40867, at

*17–18, 2006 WL 1720401, at *6 (E.D.N.Y. June 20, 2006).  *Compare J.Z.G. Res., Inc. v. King*,

987 F.2d 98, 101 (2d Cir. 1993) (no "occurrence" where faulty roads, not incorporated into a

larger entity, did not cause "consequential property damage inflicted upon a third party as a

result of the insured's activity"), *Jakobson Shipyard*, 961 F.2d at 389 (no "occurrence" where

faulty steering mechanisms in tugboats built and sold by insured did not cause damage to

property other than insured's product), *and Fed. Ins. Co. v. Marlyn Nutraceuticals, Inc.*, No. 13-

cv-0137, 2013 U.S. Dist. LEXIS 178565, at 15–16, 2013 WL 6796162, at *6 (E.D.N.Y. Dec. 19,

2013) (no "occurrence" where "contamination in the tablets is a product defect causing damage

to the tablets themselves, and not an instance in which damage has occurred to other property"),

*with Aetna Cas. & Sur. Co. v. Gen. Time Corp.*, 704 F.2d 80, 83 (2d Cir. 1983) (finding an

"occurrence" where motors built by insured caused damage to radiators into which they were

installed by purchaser), *Thruway Produce,* 114 F. Supp. 3d at 93 (finding an "occurrence" where

insured's contaminated apples were incorporated into apple sauce), *and Chubb*, 1999 U.S. Dist.

LEXIS 15362, at *24, 1999 WL 760206, at *8 (finding an "occurrence" where insured's

defective apple juice concentrate incorporated into Coca-Cola product).

Within the Second Circuit, the two most frequently cited cases by courts undertaking an

"occurrence" causing "property damage" analysis are *General Time* and *Jakobson Shipyard*.  In

*General Time*, the Second Circuit upheld the District Court's finding that the damage caused by

the insured's defective motors, which were incorporated into radiators, was an "occurrence"

where those motors caused damage to other component parts of the radiator.  *General Time*, 704

F.2d at 82.  "[B]ecause the defective motors caused damage to other property . . . that had not

been purchased from [the insured] . . . [t]he motors were thus an external force with regard to the

15

radiators." *Jakobson Shipyard*, 961 F.2d at 390 (discussing the court's reasoning in *General Time*).  Conversely, in *Jakobson Shipyard*, a shipbuilder manufactured two tugboats containing faulty steering mechanisms, which rendered them inoperable.  *Jakobson Shipyard*, 961 F.2d at 388.  Distinguishing its holding in *General Time*, the court explained that there was no "occurrence" because "[t]he faulty steering mechanisms . . . did not damage property other than the tugs purchased" from the insured.  *Id.* at 390.  Stated more simply, "when an insured is unaware . . . of a defect in its component of a product, which defect diminishes the value of the product into which it is incorporated, resulting in damage, such damage is considered to arise out of an 'occurrence.'"  *Chubb*, 1999 U.S. Dist. LEXIS 15362, at *24, 1999 WL 760206, at *8.

Here, it is undisputed that the only "products" Plaintiff provided were component leather hides—not the seat and headrest covers that Timco created from the hides, nor the airplanes into which Norwegian Airlines installed those seats.  (Dkt. No. 42-1, ¶ 4).  Notably, Plaintiff does not seek the costs of its defective work product—the leather hides—but instead seeks reimbursement of the costs to remedy the damage the leather hides caused to the larger entity into which the hides were incorporated, e.g., the cost to recut, resew, and reinstall the seat and headrest covers which were manufactured by a third-party.  As in *General Time*, Plaintiff's products were used by the purchaser as a component part in airplane seat and headrest covers that a third party manufactured.  When the leather hides proved to be defective, they caused damage to the larger entity (the seat and headrest covers) into which they were incorporated, which "was greater than the insured product itself."  *Chubb*, 1999 U.S. Dist. LEXIS 15362, at *27, 1999 WL 760206, at *8.

In sum, the arguments advanced by Defendants do not preclude coverage in this case. Plaintiff's defective leather hides were incorporated into seat and headrest covers manufactured

by Timco, and defects in those hides caused the seats and headrest covers to become damaged.

Thus, this case falls within the category of defective component cases where courts have found

"property damage" caused by an "occurrence."  *See, e.g.*, *Gen. Time Corp.*, 704 F.2d at 82;

*Chubb*, 1999 U.S. Dist. LEXIS 15362, at *14, 1999 WL 760206, at *4.  Whether any of the

exclusions contained within the CGL policy might apply to preclude coverage is a separate

matter from the initial determination of coverage, and are discussed in turn below.

      **B.**    **The CLG Policy Exclusions**

      Defendant argues that it is entitled to summary judgment because it has no duty to

indemnify Plaintiff based on certain exclusions set forth in the CGL policy.  Specifically,

Defendant argues that it is entitled to summary judgment based on: (i) the "Your Product"

exclusion (exclusion "k"); (ii) the damage to impaired property or property not physically injured

exclusion (exclusion "m"); and (iii) the recall of products, work, or impaired property exclusion

(exclusion "n").  (Dkt. No. 45-2, at 17–22).  In response, Plaintiff argues that each of these

exclusions is inapplicable because: (i) the "Your Product" exclusion does not apply in situations

where the product at issue was incorporated into and caused damage to a larger product; (ii) the

circumstances of this case fit within an exception to exclusion "m" and, in any event, the

"impaired property" exclusion does not apply because the leather hides were inextricably

incorporated into the seat and headrest covers; and (iii) exclusion "n" is inapplicable because the

leather hides at issue were never withdrawn or recalled from the market or from use by any

person or organization.  (Dkt. No. 42-25, at 15–22).

      **1.**    **"Your Product"—Exclusion "k"**

      The "Your Product" exclusion states that coverage provided by the CGL policy does not

apply to "Damage to Your Product," meaning "'Property Damage' to 'Your Product' arising out

of it or any part of it."  (Dkt. No. 42-14, at 13).  The CGL policy defines "Your Product" as

"[a]ny goods or products . . . manufactured, sold, handled or disposed of" by the insured.  (*Id.* at 24).  The parties do not dispute that Plaintiff's "product" was the leather hides sold to Norwegian Airlines, which were manufactured into seat and headrest covers by a third party.  (Dkt. No. 42-1, ¶¶ 5, 17).  Plaintiff's product is the leather hides—not the seat and headrest covers that Timco created from those hides, or the airplane into which Norwegian Airlines installed those seats.  And, as noted above, Plaintiff does not seek reimbursement for damage to its "product," i.e., the leather hides from which the seat and headrest covers were manufactured, but rather consequential damage to the seat and headrest covers that was caused by its product.  *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1210 (2d Cir. 1995), *opinion modified on denial of reh'g*, 85 F.3d 49 (2d Cir. 1996) ("This exclusion bars coverage for property damage to [the insured's] own products.  The exclusion has no application here because the . . . claimants seek to recover for damage to property other than [the insured's] products.").

Urging an alternative interpretation, Defendant argues that "any claim for damage *arising* from damage to [Plaintiff's] leather is removed from coverage."  (Dkt. No. 45-2, at 16).  Defendant, however, offers no caselaw in support of this contention and, in any event, this interpretation of the "Your Product" clause is not supported by the plain language of the provision.  The language of the clause excludes only property damage *arising out of* the insured's product *to* the insured's product—not "any" property damage arising out of the insured's product generally.  *See Tradin Organics USA, Inc. v. Maryland Cas. Co.*, 325 F. App'x 10, 11 (2d Cir. 2009) ("Exclusions like the 'Your Product' exclusion here are 'intended to exclude coverage for damage to the insured's product, but not for damage caused by the insured's product to persons or property other than the insured's own product.'" (quoting *Lowville Producer's Dairy Co-op., Inc. v. Am. Motorists Ins. Co.*, 604 N.Y.S.2d 421, 422

(1993))).  Indeed, the interpretation for which Defendant advocates would negate the purpose of the policy entirely.  *Lowville*, 604 N.Y.S.2d at 423 ("The policy was clearly intended to cover the possibility that the insured's product, once sold, would cause . . . damage to property other than the product itself.").

Regardless, the "Your Product" exclusion is inapplicable where, as here, the insured's product was incorporated in, and caused damage to, a larger entity.  *See Thruway Produce*, 114 F. Supp. 3d 81, 96–97 (citing *Harleysville Worcester Ins. Co. v. Paramount Concrete, Inc.*, 10 F. Supp. 3d 252, 266 (D. Conn. 2014) (applying Connecticut law) (finding the "Your Product" exclusion inapplicable where the insured's "product [was] the shotcrete itself and not the larger pool into which it was incorporated")); *Travelers Indem. Co. v. Dammann & Co.*, No. 04-cv-5699, 2008 U.S. Dist. LEXIS 9759, at *23, 2008 WL 370914, at *8 (D.N.J. Feb. 11, 2008) (applying New Jersey law) (damage to extract caused by defective ingredient not damage to insured's "product" under "Your Product" clause because clause is inapplicable where "loss is due to a defect in the insured's product later incorporated into buyer's product").  Accordingly, the Court finds that the "Your Product" exclusion is inapplicable.

## 2.    "Impaired Property"—Exclusion "m"

Exclusion "m" of the CGL policy excludes from coverage "'Property Damage' to 'impaired property' or property that has not been physically injured, arising out of: (1) A defect, deficiency, inadequacy, or dangerous condition in 'your product' . . . [t]his exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use."  (Dkt. No. 42-14, at 13).  Something is considered "impaired property" only if it can be restored to use by the "repair, replacement, adjustment or removal" of the insured's product or the insured's fulfillment of the terms of the contract.  (Dkt. No. 42-14, at 21-22).  Plaintiff argues that the exclusion is

inapplicable because "the delamination of the leather constitutes an accidental physical injury . . . after [its] leather was put to its intended use," and because Defendant "cannot show that the defective leather . . . could have been removed from the seat and headrest covers thereby restoring them to use." (Dkt. No. 42-25, at 20–21). Defendant responds that "any 'damage' to the seat covers (other than [Plaintiff's] failing product did not occur until after the seat covers were removed." (Dkt. No. 45-2, at 18 (emphasis removed)), and in any event, the loss was not "sudden and accidental," (*id.* at 20).

Defendant does not argue that Plaintiff could correct the damage to the seat and headrest simply by retrieving its leather hides and replacing them with other, non-defective leather. Indeed, the seat and headrest covers were completely removed and remanufactured by Timco. "Exclusion m does not bar coverage in cases where the insured's defective product has been inextricably incorporated into a finished product, such that it is impossible to remove the component from the whole." *Harleysville*, 10 F. Supp. 3d at 269 (applying Connecticut law); *Thruway Produce,* 114 F. Supp. 3d at 97 (finding the "impaired property" exclusion inapplicable where insurer did not present "argument or evidence as to how baby food tainted with rat poison could be restored to use in any fashion"); *Fireman's Fund Ins. Co. v. Amstek Metal, LLC*, No. 07 C 647, 2008 U.S. Dist. LEXIS 75879, at *32, 2008 WL 4066096, at *11 (N.D. Ill. Aug. 27, 2008) (explaining that "Impaired Property" exclusion is inapplicable where defective wire was manufactured into transmission spring packs, because manufacturer could not "correct the injury to its product by retrieving its transmission spring pack and replacing [the insured's wire]. Instead . . . the break of [the insured's product] rendered the transmission spring pack irreparable.").

There is no evidence that the leather hides could have been retrieved, repaired, or removed from the product into which the hides were incorporated—the seat and headrest covers—without completely destroying the seat and headrest covers themselves. Defendant has thus failed to establish that the seat and headrest covers into which Plaintiff's product was inextricably incorporated could be restored to use by "repair, replacement, adjustment or removal" of Plaintiff's leather hides, as required to satisfy the "Impaired Property" exclusion.[7] Accordingly, Defendant's motion for summary judgment must be denied on this ground.

### 3.    "Product Recall"—Exclusion "n"

Finally, Defendant invokes the "product recall" exclusion, which bars coverage for "[d]amages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of [your product] if such product . . . is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it." (Dkt. No. 42-14, at 13). In response, Plaintiff argues that its products—the leather hides—were never withdrawn from the market, but only the seat and headrest covers into which its product was incorporated, i.e. the seat and headrest covers manufactured by Timco.

Under New York law, the "Product Recall" exclusion is applicable only where the insured itself has withdrawn or removed its products from the market. *See Stonewall Ins. Co.*, 73 F.3d at 1211 (2d Cir. 1995) ("Under New York law, the ["Product Recall"] exclusion does not preclude coverage in this case, because [the insured] has not itself withdrawn or removed its products from the market."); *Thomas J. Lipton, Inc. v. Liberty Mutual Ins. Co.*, 34 N.Y.2d 356,

---

[7] Plaintiff's motion for summary judgment also raises the alternative argument that the exclusion does not apply because the impairment occurred "suddenly and accidentally." In light of the Court's conclusion that the property in question is not properly considered "impaired," the Court need not reach this issue.

360 (1974) (exclusion precludes coverage only if insured itself withdrew product from market).

Although the record does not indicate whether Plaintiff's product was recalled or removed from

the market in the more typical sense (e.g. replaced regardless of whether defects had physically

manifested or withheld from sale upon the suspicion that products from the same lot were

similarly defective), there is no question that it was the seat and headrest covers into which

Plaintiff's product was inextricably incorporated that were removed from the aircraft. *See*

*Thruway Produce*, 114 F. Supp. 3d at 96 ("The [insured's products] themselves were not

recalled. Rather, the baby food into which [they] were incorporated was recalled."). Moreover,

even if damage caused by Plaintiff's defective leather hides resulted in a recall of Plaintiff's

products, "the exclusion would not preclude damage to property other than [Plaintiff's]

products." *Stonewall Ins. Co.*, 73 F.3d at 1211 (2d Cir. 1995) (explaining that the "product

recall" claim does not apply where the insured's liability "arise out of damage that its products

have caused to third-party property").

Accordingly, the exclusion is inapplicable, and Defendant's motion for summary

judgment must be denied on this ground.[8]

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 42) is **GRANTED**

to the extent that it is entitled to declaratory judgment that Defendant has a duty to reimburse

Plaintiff for the property damage that the delaminating leather caused to Norwegian Airlines.

---

[8] Plaintiff further argues that, because of its reliance upon Defendant's December 10, 2014 partial disclaimer
indicating that the costs of remedying the damaged seats would be covered, Defendant is now estopped from
arguing that the damage is not covered by the policy or that an exclusion otherwise applies. (Dkt. No. 42-25, at 20).
Because the Court has determined that Plaintiff's claim is within coverage and no coverage exclusions apply, it is
unnecessary to reach the issue here.

Plaintiff is therefore awarded judgment against Defendant in the amount of $197,100.05 plus interest at the statutory rate of 9% per annum[9] from October 6, 2015; and it is further

ORDERED that Defendant's cross-motion for summary judgment (Dkt. No. 45) is DENIED;

ORDERED that the Clerk is directed to enter judgment accordingly and to close this case.

IT IS SO ORDERED.

Dated: March 9, 2018
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[9] "In New York, the statutory rate for prejudgment interest in a breach of contract action is 9% per annum." *Sack*, 2003 WL 22682043, at *4, 2003 U.S. Dist. LEXIS 12279, at *12 (citing N.Y. C.P.L.R. § 5004). Prejudgment interest "must be calculated on a simple interest basis." *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998).